Case number 152516 Lee Kibler v. Robert Hall II et al. Oral argument not to exceed 15 minutes per plaintiff, 15 minutes to be shared by defendants. Mr. Craig Schaefer for the appellant. Thank you, Your Honors. My name is Craig Enrico Schaefer, and I am the attorney for Jason Lee Kibler, who is the appellant and plaintiff in the underlying action. I'll be reserving three minutes for rebuttal. That's fine. You may proceed. This is an appeal from a district court decision granting summary judgment in favor of the defendants in a trademark infringement case between my client as the plaintiff who went as DJ Logic or Logic against the defendant who is a new rapper into the space by the name of Logic. The central issue in the case is whether relevant consumers are likely to believe that there are products or services by the parties that are affiliated in some way. It is our position that the lower court had misappropriately applied some of the underlying cases to the Frisch factors, inappropriately engaged in weighing of the evidence, and did not, in fact, view the evidence in a light most favorable to my client, the plaintiff. I know that Your Honors have reviewed the facts, and so I'll reserve my introduction of the facts as we go through the Frisch factors. The court essentially found that one of the factors, actual confusion, slightly favored my client, that two of the factors favored the defendants, those being the strength of the mark and the similarity of the mark, and that the other factors were neutral, ultimately concluding that on balance and considering all the factors together that no reasonable jury could find that consumers would be likely to confuse DJ Logic with Logic in the marketplace. In a trademark case, context is always everything, and these are always fact-specific cases, so I think it's really important for us to remind ourselves what we're talking about here. We're talking about music. Music is inherently cross-genre, where musicians borrow from many different influences in order to come up with their unique sounds. At one point in my preparation of this case, I got the impression that there are lots of people in music who use the word logic, that there's 2AM Logic, 3 Logic, E Logic, Funk Logic, Hard Logic, Kid Logic, Re Logic, etc. So would you say that there's a likelihood of confusion with respect to all of those, so that you could stop all of those people, whoever they are, from using those names? Your Honor, thank you for the question, and the answer is, number one, most of those would not be admissible in the underlying action because on their face, their web page printouts, they're not even trademark registrations. Keep in mind, the evidence in this case is there's no other registered trademark for logic that was admitted. But my question is really, can you bar, you could turn it into a hypothetical if that makes it easier, could you bar the use of all of those names by anybody in the music industry who's doing popular stuff? It would be the same analysis as we're going through here, but most of these, over 90% of them, don't do business in the United States, or at least there's no evidence that they do. They're foreign language websites, they're clearly from the UK, New Zealand, Latin America, with no proof by these defendants who are the ones that bear the burden of proof on this issue. If they were in the U.S., you're... Potentially, yes. You could... Potentially, yes, if they're likely to cause confusion. So it would depend on, again, the fish factors there. But if we look at the declaration of Ms. Price, which was this third-party issue, you can see just by looking at the Exhibit 1 to her declaration that the first one, DJ Full Logic, foreign language site, no evidence of any U.S. use. And keep in mind, in a trademark case, it's all territorial. Territoriality governs what is relevant evidence. Anything outside the United States wouldn't even be admissible since it's not relevant to the inquiry as to whether or not, in U.S. commerce, there's been a use. Second one, DJ Logic, Spain. Third one, DJ Logic, UK. Fourth one, DJ Logic, 300 page likes. Fifth one, DJ Logic official, no longer available webpage. Sixth one, DJ Logical, New Zealand. So our position with the lower court is they have... Let me just see if I heard you right. So there are other, not just other musicians that use Logic somewhere in their name, but there are other DJ Logics? In the U.S., there's evidence of one. But other, there are others. I'm just... In the U.S., there's one, yes. But there are others around the world? Potentially around the world. Potentially around the world. But the issue here is... I understand. I'm just trying to see if I heard you correct. Sure, that's correct. So there is or was a wedding DJ in Georgia, apparently, who used DJ Logic. So in this case, the relevant evidence would be one other use and no other trademark uses. Our fundamental position on most of these issues is that these issues go to weight and they go to the finder of fact. That is to say... I want to interrupt for a second. So if we're talking about issues that go to weight, could you move on to the issue of strength of the mark? Because my question really goes to the commercial strength of the mark and how we should be looking at that. Is there... The district court found that there really was not great strength, I think, to the mark here. And that DJ Logic is not well recognized, has not attained a great deal of public recognition, and is not well advertised. But what should we be looking at? Should we be looking at just the fact that he, along with most artists, are now using the Internet? Should we be looking at the fact that DJ Logic has just sold a small number of albums the past three or four years? And is not as commercially successful as Mr. Hall? Sure. So it's a great question. And the answer is we should be looking at whether or not there is a material tribal issue of fact on that issue, given the evidence that was submitted. And here's what the evidence that is part of the record shows. The trial court said there was no evidence of marketing. In fact, there was evidence of marketing. They found that the court concluded that 60,000 album sales over 16 years somehow showed a lack of recognition. Well, could that have been a reference to the last three years when there were only an average of 100 albums a year? Sure. That would be part of the evidence that a finder of fact, we believe, could conclude, is this mark a strong mark, correct? But 60,000 album sales, sure, compared to Beyonce, may not be a lot. But for small, medium-sized businesses across the United States, if you sell 60,000 of something, you certainly have the ability to make an argument that your trademark is significant and potentially strong. And 60,000 album sales from our point of view would allow a finder of fact to conclude that DJ Logic, in fact, had a strong trademark based on that number. Now, just because he hadn't released an album in a couple of years that was commercially successful doesn't mean you can't look at the entirety of his record from 1999. Well, he's up against somebody who has released only one album and has sold 170,000 copies of it. I mean, everything's relative. Everything is relative. And, Your Honor, it is one of the facts that I think that a finder of fact would have to take into consideration. I think if you look even at the preliminary injunction hearing transcript, the trial judge seemed to have this sense that whoever is bigger wins. That is to say that clearly the defendant, with Def Jam Records behind it, has sold more and potentially may sell many more. But just because the defendant sells more widgets or records or albums than the plaintiff does not mean in the trademark world that they win. The issue is one of likelihood of confusion or reverse confusion as a result of tremendous sales. So when the court found that there was no recording contract, in fact, there had been recording contracts through the years in order to distribute these many records, the court found there was no record label. In fact, there were record labels as indicated in the declaration of Mr. Kibler for all of his album releases. And so there are clearly erroneous findings which ignore the evidence in the case and certainly do not take the evidence in the light most favorable to the plaintiff. I think that, Your Honor, also raises a really good issue, which is in this space, in this market, people really, you know, album stores, record stores are largely obsolete. Recording artists do two things, live performances and distribute over the Internet. And, in fact, there was evidence of marketing over the Internet in this case. The plaintiff testified that he distributed his music through the same channels as the defendant, iTunes, Amazon download, streaming services who only pick up certain artists like Pandora and Spotify. Those are overlapping markets that would allow a jury, a reasonable jury, to conclude that, in fact, my client's trademark was strong. Doesn't Mr. Kibler contend that, you know, really he operates, you know, I know these are musicians who, you know, have live performances and operate in some similar ways, but that he really operates mostly in a different genre. You know, he uses a turntable. He mixes music. It's very eclectic. Whereas Mr. Hall is a rapper, more of a vocalist. You know, just Mr. Kibler, I think, says that Mr. Hall is edgier, is more of a raw style. It just seems that there are some real distinctions in terms of the genres in which they operate. There are some distinctions. I mean, major distinctions. And there are distinctions. But in music, when you go, number one, this is a low-cost item. You go, you download, you go to Pandora, you do a search for Logic, and things come back, right? Potentially both of our clients. And so while there is a difference between the types of music, the genre is still potentially hip-hop. And my clients, the thing that my client achieved in the market since 1999 is the ability to use a turntable as an instrument similar to a guitar. Now, so one fact would be that, yes, there's this edgy, raw, swearing, degrading of women, police brutality lyrics. And my client is none of those things, right? But it's hip-hop. And what do rappers use and have they used since the beginning? Turntablists, DJs. And, in fact, my client, even though he's the turntablist, works with other artists who provide vocals. So these are the types of fact issues that we believe a jury should be able to assess. I have just one more question. I know your time is expiring. I want my colleagues to be able to ask some questions. But the record shows, as I understand it, only 10 or so possible instances of actual confusion. Not really in purchasing decisions, really just inquiries. Parties a little bit maybe confused about whether it was DJ Logic playing at one place or Logic, as I'll use those names. That's a very small number of incidents of confusion. And I know we're trying to draw lines in terms of where there are disputed facts that would get your client to trial, whether it's 60,000 albums or 10 actual confusion incidents. So isn't that just really de minimis, especially in light of the 170,000 albums that Mr. Hall sold in the last seven or eight months? Well, we actually think that a reasonable jury could conclude that 10 actual instances of confusion is, in fact, significant. In fact, in some of the cases that are cited, it was only a single instance of confusion that this court of appeals found was for the jury to decide as to whether or not that was significant. So 10 instances of actual confusion. If any one of those is a strong incidence of actual confusion, that solves the issue because that shows a likelihood of confusion. What is your best case to say that 10 or fewer instances alone would be enough to show likelihood of confusion, or at least to get it to a jury? Sure. Let's see. The Daddy's Junkie Music instance was one single instance of confusion. And the court of appeals decided that that put the issue to the jury in reversing the district court on summary judgment. Which one was that? I'm sorry. That's the Daddy's Junkie Music, which we believe is really the controlling case. It was the one instance alone was enough? One instance alone. As opposed to other factors in the eight-factor Frisch test? Well, okay, so then you still have to look at all the other factors. But on that narrow issue, the ruling was that the single instance of confusion allowed the issue of whether or not there was actual confusion to go to the jury. That is to say, again, actual confusion pretty much resolves the whole case in terms of material issue of fact. Because if there's actual confusion in the marketplace, then we know there's a likelihood of confusion. And even though actual confusion isn't ever required, and a lack of actual confusion does not help their motion at all because courts recognize that rarely does it ever exist. In this case, we had 10, and we believe that that is significant and that that would allow a jury to find a likelihood of confusion along with all the other factors. One of the things that puzzled me was the trial judge's determination that the intent in selecting the mark was a neutral factor. As I recall, the defendant came up with the term logic as a diminution of his original name, which was psychological. It would seem there's no bad intent if all he's done is shorten a name that he's been using, a name that I gather you wouldn't have any problem with. The testimony was that he actually did an internet search before choosing the name to see if anything else was out there. And since my client was out there and predominant on the internet as DJ Logic, we believe a jury could easily conclude that he knew of the mark. And the test isn't whether or not he wanted to infringe, it's whether or not he had notice of our mark before selecting his own. So who was it that testified that he did that internet search? It was the defendant Hall himself, testified that he did an internet search before selecting the name. A jury could easily conclude he must have seen our prior trademark use because our guy was predominant on the internet. Well, unless he looked and decided that shortening his to Logic wasn't the same as DJ Logic and went ahead and did it. Now we have a lawsuit to resolve that, but it's not crazy to have come to that conclusion. Well, and we see this all the time, right? Where the defendant doesn't understand trademark law enough to know that there may be no, from a legal point of view, difference between the two. But if he was aware of it, that satisfies the intent element under the Big Daddy case. It doesn't have to be knowledge of infringement, it's knowledge of the mark. Okay. Thank you, Your Honors. Have your full rebuttal time. Good afternoon, Your Honors. May it please the Court. Let's begin with strength of the mark. Let me just make sure I understand how you're splitting your time. Sure, Your Honor. I'm taking nine minutes on behalf of the whole defendants, and each of my two colleagues are taking three minutes apiece. Okay, great. In terms of strength of the mark, Your Honors, strength depends upon recognition by the public in the marketplace. There is no evidence in the record that DJ Logic is recognized by consumers. Appellant Kibler provided no survey evidence. His sales of five albums over 16 years is meager, and there are 90-plus other artists who are selling in the United States through the same exact online music stores, Amazon and iTunes, as Mr. Kibler. You say his sales are meager, and opposing counsel says they're not. 60,000 albums is a fair amount? Well, perhaps in a short time period for one album, maybe. But we're talking about his entire career, his 16-, 17-year career, all of his albums. That's a small number of sales. Most recently reflected in the only time where we have annual sales in the record are the two-and-a-half years, last two-and-a-half years of Discovery where he sold only 300 albums over those two-and-a-half years in total. And unlike what was represented, there are 90 other Logic formative trademarks in connection with music being sold in the U.S., not foreign sales, in the U.S., on Amazon, and we have the evidence, and we cite to it on page 6 of our brief, Your Honors. As I understand, your opponent was trying to say that because they were foreign that they didn't count in this factoring. Perhaps, but I heard him say that they're not in the United States, but these are U.S., Amazon.com, iTunes, in the United States. You can right now on your computers go there and buy the album. You search on Logic. You're going to get all these hits, and we have the printouts in the record. It's a crowded field, and a crowded field means you have a narrow, weak trademark. In terms of similarity of the marks, Your Honors, we must focus on the marks in their totality. The DJ Logic in its totality, besides having a different look and sound, suggests a characteristic of the appellant's music, and the DJ Logic, if you ignore the DJ, you're ignoring what distinguishes his mark from most of those other 90 other Logic artists that are selling music in the United States. In the context, especially in the context of all those crowded field Logic users, DJ Logic and Logic are dissimilar. Is it true, as counsel says, that as few as a single instance of confusion is enough to take that factor to the jury? We cite a number of cases in our briefs, Your Honor, that have found in context a small number, more than one, 10, 15, whatever the numbers are in our brief, it was more than one, are de minimis and are, if anything, given the right circumstances and facts, show the lack of a likelihood of confusion because there's so few instances of confusion in context. The question is how much is enough to create a jury question. That's really what we've got to look at. Understood, and there is no bright line test, Your Honor, but I can tell you that the facts are, to which you judge the 10 against, the facts are that both parties have been making music and providing their music services for years, since 2009. They've both been in the marketplace contemporaneously. There were 1.9 million downloads of Mr. Hall's pre-Def Jam albums. His YouTube videos have been watched 58 million times. He has 400,000 plus followers on Twitter, over half a million followers on Facebook. When Mr. Hall puts out a tweet or a Facebook comment, it's seen by half a million people. So how does DJ Logic compare? Do you have those figures in your head? I don't, but they're much smaller. Indeed, one of the big areas of the failure of evidence on the part by Appellant Kibler is the extent of his marketing. If he wants to prove consumer recognition, how much has he spent on advertising? How many people visit his webpage? Is it one a year? Is it a million a year? No evidence. There's no evidence of the extent of his marketing. He cited the Daddy's Junkie music as an example of where one actual event of confusion was enough to get the case to the jury. How would you respond to that? Yes, Your Honor. On page 29 of our brief, we have a number of cases that we cite where seven isolated instances was considered de minimis. That was the King of the Mountain sports case. We have the Sunbanks case, fewer than 15 instances of confusion. But I'm asking you about Daddy's Junkie music. Oh, I'm sorry. I thought you were asking me for contrary cases. No, I said he cited Daddy's Junkie music as saying that one incident of actual confusion was enough to get to the jury. And I'm asking how would you distinguish that? Because, Your Honor, in that case, both parties were marketing their stores as Daddy's. And there were a lot of facts over lots of factors that caused the court there to, in total, on balance, decide, yeah, we need to send this to a jury. It was not merely because there was a single person confused. In addition, as far as the actual confusion evidence goes, it was also qualitatively insignificant because none of those instances involved a confused consumer making a purchase, which is the core of what confusion is concerned about in a trademark case. And, in fact, Your Honors, Appellant Kibler came into this lawsuit with that simple, the same set of ten or so pieces of alleged confusion. He sought a preliminary injunction before Mr. Hall had issued his first commercial album with Def Jam to try to stop that. He sought a preliminary injunction to stop the album. And, in fact, he argued that those same ten pieces of evidence showed there would be massive confusion, that was his phrase in his brief on preliminary injunction, massive confusion if Mr. Hall were allowed to have his Def Jam album released and tour in support of that album. Well, the preliminary injunction was denied. The album was released. We had seven months of sales of that 170,000 sold. In this day and age of MP3 sharing, he still sold 170,000 units. He's toured nationally for those seven months. We had seven months of discovery. There's not a whit of actual confusion evidence resulting from any of that activity. It's got the same ten pieces that he started the case with. Your Honor, in terms of intent to infringe, I think it was Judge Daughtry who noted correctly that the record is clear. In high school, Mr. Hall had used the stage name Psychological, and when he decided to try to make a name for himself, he shortened it to Logic. That was adopted by Mr. Hall in 2009, three years before being contacted by Appellant Kibler in a cease and desist letter. There's no- What does the record show in terms of Mr. Hall's understanding of the use of DJ Logic at the time that Mr. Hall chose the name Logic? Mr. Hall testified flat out that he had never heard of Mr. Kibler or DJ Logic when he adopted the mark, and in his testimony, which we cite in our brief of Mr. Kibler, Mr. Kibler admits he has no reason to think that Mr. Hall would have known of him before the cease and desist letter in 2002. So there wasn't an Internet search or anything like that by Mr. Hall? What Mr. Hall testified to was that when he was adopting the mark, he searched for other rappers named Logic. That's his testimony, and Mr. Kibler submitted a declaration saying, well, if you had searched on musician Logic on that phrase, you would have found out about me. So they're trying to argue there should be an inference that if you searched on musician Logic, you would find Mr. Kibler, then he had knowledge. There's a lot of flaws with that argument. Number one, Mr. Hall didn't testify he searched on that phrase, musician Logic. He said he was searching for other rappers named Logic. Number two, the fact that he did the search on Logic shows he already had chosen the name Logic before he would have found Mr. Kibler, even had he done that hypothetical search. Beyond all that, Your Honors, I believe that the case law is not as it's been described to you, but the case law is mere knowledge is not enough. In the AutoZone case, for example, and several other cases we cite you, it's not a question of just knowledge of the existence of a prior mark. AutoZone was famous for dilution purposes in that case, and RadioShack knew about it. But when it named its store PowerZone, the issue the court said was not did you hear of the mark, but did you intend to trade on the goodwill of the other party's mark? Was there an intent to confuse? There was none there, and there's absolutely none here. In fact, it makes no sense. Why would a 20-year-old rapper want to trade on the goodwill of a 40-year-old turntablist, eclectic musician with meager sales, and who finds rap lyrics offensive? It makes no sense. There's no intent to confuse. There's no evidence even of any knowledge. Your time has expired. Thank you, Your Honors. Thank you. May it please the Court. I'm Eric Shimanoff here on behalf of the label Def Jam. I just want to pick up where we left off in the discussion of intent. As Mr. Brothman pointed out, the law is very clear that mere knowledge of another person's trademark does not equal intent to usurp someone's goodwill or intent to cause confusion. If that were the case, then no trademark case could ever be decided on summary judgment because under the Lanham Act, the Lanham Act gives constructive notice by virtue of registration to everyone in the world about somebody's rights. And if mere knowledge or even constructive knowledge was enough, then we'd never have any summary judgment in a trademark case. Plus, I think as Judge Daugherty pointed out, you can do a trademark search. You can make a determination based on all the evidence you see in front of you that the mark is not going to infringe even if you do conduct a trademark search. So the only cases where the courts have talked about mere knowledge always were in conjunction with other factors that pointed to a likely confusion. I also want to make a point because it seems from the very beginning that Mr. Kibler would like to analyze trademark infringement in a vacuum and not focus on what's happening in the marketplace, which is what lays the foundation for the true test of likelihood of confusion. He talks about third-party uses, that none of these were registrations. Well, actually the law is the opposite. The law is that mere registrations, which are not proof of use, don't show what's going on in the marketplace. But Internet printouts do show what's going on in the marketplace. And even without the full scope of these uses, the sheer numerosity of these third-party uses shows that Mr. Kibler is only entitled to a very, very narrow scope of enforcing his rights. And that's where everything stems back to in this case. Because you can't just say, well, factor one under Frisch went to defendants, factor two under Frisch went to plaintiffs, the rest were neutral. Everything has to be analyzed in the context of what is the marketplace reality. And the marketplace reality here is that defendant has a very weak mark commercially. He was told so when he came to seek his preliminary injunction, and on summary judgment he produced nothing. We sat there at his deposition and said, as you sit here today, can you tell us what is the scope and extent of your marketing promotional advertising efforts? And he said no. We didn't see any evidence. Just because someone is on the Internet, I think as the Sixth Circuit pointed out, it's no different than if somebody were listed in the yellow pages, because that's all it is. We don't have any evidence as to the strength. I also want to talk quickly about the evidentiary issues that were brought up, including the foreign registrations. While trademark rights are territorial, and Mr. Kibler can assert extraterritorially trademark rights in the U.S., whether his mark is weak or strong in the U.S. is contingent upon what consumers are exposed to in the United States. And even if there are some uses in the U.K. or abroad, the fact that other consumers can see those and can download that music off of iTunes shows in the U.S. marketplace, regardless of where this music originates, in the U.S. marketplace, his mark is very weak. And I do note I'm out of time if you have any questions. Apparently not. Thank you. Okay. Thank you very much. May it please the Court, my name is Michael Garfinkel. I'm here representing Defendant Appellee William Morris, Endeavor Entertainment, LLC. We join in the arguments you've heard from the other defendants, and I'm here just to add a couple points because we are in a different situation than our co-defendants. William Morris Endeavor, also known as WME, is a talent agency. It books, in addition to representing people on TV, it books shows. It has nothing to do with the sales of records. So an artist like Logic is looking to do sales with Def Jam, that has nothing to do with us. If the artist is looking to tour, to come to Cincinnati for a show, that's where they go to WME. And WME books performances. They'll reach out and book a performance. WME is not a manager. Logic has a manager who looks at his career, makes decisions with him, and makes sure that he's on the path that they want him to as an artist. What WME does is book. And, again, that's only services. The testimony in this case is so, therefore, I should just point out that that means there's no direct liability. Even if the court were to disagree with my colleagues, there is no liability as to WME. WME is only booking the act at different venues. The testimony comes from the booking agent who says what he does is call different places and tries to figure out if there's people interested in booking him, and Katie Vaughn, who does tour marketing, who testified she does not do advertising. She has no input in advertising. WME had nothing to do with the selection of the name Logic. All it does is book Logic. Suppose that Logic used the name DJ Logic. Would you then potentially have some liability if you didn't check to make sure that he wasn't the same or different than the other DJ Logic? We have no obligation to police. We cited the Hard Rock case, which is a case that we get into on the contributory liability. There's no responsibility for us to police. But if I may then go on to the contributory negligence, which is where you're leading, in that case what the plaintiff does is rely upon inward labs and say that you can be contributory liable if it continues to supply a product to one who has reason to know that the person is engaging in trademark infringement. Well, there's no evidence of any knowledge by WME of any infringement. The best they can do is say, well, WME got a demand letter, a cease and desist letter in 2012. Well, what the testimony is is they got the letter. Well, we cite two cases that show that a demand letter alone does not put you on notice of an infringement. It might put you on notice of a potential claim but not an infringement. And what WME did was turn it over to plaintiff, I mean, excuse me, to defendant Logic, his manager and his counsel, and say, you know, here, I got this letter. And nobody at WME ever heard about it again. There was no follow-up. There was never anything to put them on notice that there might be a problem continuing. And then I would just add that from there the plaintiff goes into a bunch of cases which we've addressed and are addressed in the lower court papers if necessary, which I don't think it is, where the plaintiff is basically trying to say there's some kind of willful blindness by WME. And those cases are easily distinguishable, but I see I'm out of time, so I would be happy to address any of them if the court would like. Apparently not. Thank you, Mr. Garfinkel. Thank you. Your Honors, I think counsel and I agree on one thing, that we are talking about what are consumers exposed to. So while my client didn't advertise in the newspaper or put in ads in big magazines, let's talk about what consumers were exposed to. They were exposed to over 400 live performances, 60,000 people bought albums. My client has played on Jimmy Fallon, The Today Show, Good Morning America, CNN, BBC. To say that there is no fact issue as to whether or not the public recognizes DJ Logic as DJ Logic or even Logic would require you to ignore the record in the case. He's played with Carly Simon, John Mayer, Widespread Panic, all these famous artists over a career. They have played at 15 of the same exact venues. So there is evidence in this record from which a reasonable jury could conclude that there is similarity in marketing channels, that the marks are similar, and that there's sufficient overlap in the market. Keep in mind, Big Daddy's really is the case that we rely on, is what we think is the controlling case here. It's very similar. That the court reversed the district court's grant of summary judgment when the marks were Big Daddy's Family Music Store versus Daddy's Junkie Music Stores. And it went back for trial on the merits. And here we have DJ Logic versus Logic. Big Daddy's, you had used equipment versus new equipment. Here we have hip-hop, one is a turntablist, one is a rap artist. Our case, we believe, is much stronger than Big Daddy's across most of the factors. What we hear is this concept that bigger somehow has the advantage, that if you're bigger, if you become more popular than the original, the superior trademark owner, that somehow you win. Now we get that that creates certain fact issues about how much confusion there might be and otherwise. But in America, under trademark law, being bigger doesn't mean you win. Small companies, medium-sized companies, have trademark rights too. And they have a right to a jury on those rights. So there is evidence of exposure and there is evidence of marketing. So Big Daddy says that the test is not whether or not someone buying a record is likely to confuse. There's a great quote in Big Daddy that essentially says that it is whether or not someone, even being somewhat careless in the general market, might be confused and specifically rejects the proposition that it has to be point at sale. That is not the law in the Sixth Circuit. With regards to WME and contributory infringement, the Fair Deals case is the one they rely on. We also agree, and it indicates that 16 days' notice in that case was not adequate and because there was no registered trademark. In this case, you had a year-and-a-half notice, the filing of the complaint notice, ultimately holding off on the release of the album, preliminary injunction, and you had a registered trademark. So even under that case, it's up to the jury to define whether or not there's contributory infringement. Thank you, Your Honors. Okay, thank you, Mr. Schaeffer, and thanks to all counsel who appeared today. We appreciate your arguments. The case will be submitted.